Ligeri et al v. Youtube, Inc. et al Doc. 1

Benjamin Ligeri vs. YouTube, Inc. et al 7/22/08 3:45 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENJAMIN LIGERI, <br><br> Plaintiff, <br><br> v. <br><br> YOUTUBE, INC., <br> YOUTUBE, LLC., <br> THE YOUTUBE TEAM, THE YOUTUBE <br>   PARTNER SUPPORT TEAM, and All <br>   Other EMPLOYEES and AGENTS of <br>   YouTube, Inc. and Google, Inc. <br>   involved in the allegations set forth <br>   in this Complaint, <br> GOOGLE, INC., <br> HARRY L/N/U, personally, and in <br>   his capacity as employee or agent <br>   of YouTube, Inc. and/or Google, Inc., <br> HEATHER L/N/U, personally, and in <br>   her capacity as employee or agent <br>   of YouTube, Inc. and/or Google, Inc., <br> WYNSTON L/N/U, personally, and in <br>   his capacity as employee or agent <br>   of YouTube, Inc. and/or Google, Inc., <br> KAVITHA L/N/U, personally, and in <br>   her capacity as employee or agent <br>   of YouTube, Inc. and/or Google, Inc., and <br> EVELYN L/N/U, personally, and in <br>   her capacity as employee or agent <br>   of YouTube, Inc. and/or Google, Inc. <br><br>                    Defendant. | No.: 08 CA 11394 DPW <br><br> COMPLAINT FOR DAMAGES; <br> ANTITRUST VIOLATIONS; <br> CAN-SPAM ACT VIOLATIONS; <br> UNPAID WAGES; UNPAID SHARES; <br> and BREACH OF CONTRACT <br><br> MAGISTRATE JUDGE _Bowler_ <br><br><br> **JURY TRIAL REQUESTED & DEMANDED** |

COMES NOW the plaintiff, BENJAMIN LIGERI, for his Complaint against defendants YOUTUBE, INC.; YOUTUBE, LLC.; THE YOUTUBE TEAM, THE YOUTUBE PARTNER SUPPORT TEAM and All Other EMPLOYEES and AGENTS of YouTube, Inc. and Google, Inc. involved in the allegations set forth in this Complaint; GOOGLE, INC.; and HARRY L/N/U, HEATHER L/N/U, WYNSTON L/N/U, KAVITHA L/N/U, and EVELYN L/N/U, personally, and in his/her capacity as employee or agent of YouTube, Inc. and/or Google, Inc., (collectively "Defendants" -- or "GooTube" for defendants YouTube and Google) and alleges as follows:

## I. PARTIES

1.1(a). <u>Plaintiff Benjamin Ligeri</u> (hereinafter "Plaintiff") is a resident of Rehoboth, Massachusetts at the address of 39 Wheaton Ave., Rehoboth, MA, 02769, and was at all times during of the events of this Action.

1.1(b). Plaintiff operates several channels on YouTube.com. Plaintiff's main channel is located at the URL: 'Youtube.com/Bennybaby' (hereinafter "Bennybaby"). A "channel" is a centralized location where YouTube users or visitors can see the public videos and other content of YouTube account holders.

1.1(c). Plaintiff has created and uploaded over 100 videos to his Bennybaby channel, which can be found via a search of the channel as well as through other various means, such as through search engine queries or by a direct link provided by Plaintiff directing a potential viewer to one of Plaintiff's videos located on YouTube.com. Plaintiff's creative content has garnered over <u>3.5 million views</u> on YouTube.com, and over 2 million views through his Bennybaby account.

1.2(a). <u>Defendant YOUTUBE, INC.</u> is a Delaware corporation with its principal place of business in San Bruno, California, and owns and operates the website: 'YouTube.com'.

1.2(b). Defendant YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California. On information and belief, YouTube, LLC is the successor in interest of YouTube, Inc. YouTube, Inc. and YouTube, LLC and YouTube.com are referred to collectively herein as "YouTube" or "GooTube".

1.2(c). YOUTUBE.COM--ranked in the top five most visited sites on the internet--is a website that uses the traffic derived predominantly from the creative content and marketing efforts of Laborers ("Laborers" defined below)--as well as the pirated content of other YouTube users--to market products and services to all YouTube users and visitors -- including the heavy marketing of obesity-inducing foods and alcohol to minors. GOOGLE.COM is ranked number 1, and according to Nielsen NetRatings, Yahoo.com comes in distant second with not even half of Google's traffic. [As used herein the Complaint, a "Laborer"--which includes Plaintiff--is anyone who's exhausted substantial effort or resources, without payment, to the betterment of GooTube's businesses or revenue. Capitalized derivatives of "Laborer"--such as "Labored"--invoke the same definition].

1.3. Defendant THE YOUTUBE TEAM, THE YOUTUBE PARTNER SUPPORT TEAM, and All Other EMPLOYEES and AGENTS of YouTube, Inc. and/or Google, Inc. are the employees of GooTube who are involved in the allegations of this Complaint. THE YOUTUBE TEAM are also the employees/agents of Defendants that sign their emails "The YouTube Team". THE YOUTUBE PARTNER SUPPORT TEAM are the employees and agents of Defendants who sign their email correspondences "The Youtube Partner Support Team" as well as all those who have correspondended with Plaintiff in the processing (or lack thereof) of his application to the revenue sharing YouTube "Partner Program". All defendants referenced in this paragraph of the Complaint are referred to collectively herein as "YouTube Agents" or "YouTube" as well.

1.4(a).   YouTube is a wholly owned and controlled subsidiary of <u>defendant Google, Inc.</u>, a Delaware corporation with its principal place of business in Mountain View, California.

1.4(b)    In addition to owning YouTube, Google is also a partner or teammate of YouTube's. Google *powers* certain aspects of YouTube.com, meaning they provide ads as well as the tools for search, etc. Google affixes its "Ads by Google" on numerous areas of YouTube.com.

1.4(c).   Defendant Google, Inc. additionally operates in all fifty states and internationally on the internet as 'Google.com' et al, which is ranked the most popular website on the internet. Google, Inc. and Google.com are referred to collectively herein as "Google" or "GooTube".

1.4(d).   Pursuant to a transaction that was publicly announced on October 9, 2006, and closed on November 13, 2006, Google acquired YouTube for $1.65 billion. Google stock closed at $481.03 per share on November 13, 2006, and has since soared as high as $741.79 per share (on 11/06/07), and has currently closed at $554.53 per share (as of 7/8/08).

1.5.      Defendant HARRY L/N/U (hereinafter "Harry") is an employee/agent of YouTube, Inc. (and/or Google, Inc.) who has corresponded with Plaintiff via email on behalf of YouTube's Copyright Agent office and who has violated the Digitial Milennium Copyright Act ("DMCA") and who has personally and intentionally afflicted Plaintiff with emotional distress. Harry's last name may be incorporated into this Complaint upon lawful disclosure by Defendants. For Defendants' purposes and other reference purposes, certain emails between Harry and Plaintiff can be identified with the reference number #175848596 located in the subject heading of the email.

1.6.      Defendant HEATHER L/N/U (hereinafter "Heather"), is an employee/agent of YouTube, Inc. (and/or Google, Inc.) who has corresponded with Plaintiff via email on behalf of YouTube's Copyright department, and who is believed to have violated the DMCA. If the Heather

who communicated with Plaintiff is the same Heather as YouTube's designated "Copyright Agent", then her name is Heather Gillette and she works for YouTube at 901 Cherry Ave., San Bruno, CA 94066. Heather's last name may be further incorporated into this Complaint upon verification that she in fact Heather Gillette or upon further lawful disclosure by Defendants. For Defendants' purposes and other reference purposes, certain emails from Heather to Plaintiff can be identified with the reference number #149993131 located in the subject heading of the email.

    1.7.        Defendant WYNSTON L/N/U (hereinafter "Wynston"), is an employee/agent of YouTube, Inc. (and/or Google, Inc.) who has corresponded with Plaintiff via email on behalf of YouTube and who has made false promises to--and breached agreements with--Plaintiff, including, but not limited to, false promises and agreements to provide information and answers on Plaintiff's application to YouTube's revenue-sharing Partner Program and advertising program, to support and applaud Plaintiff's efforts, to promote or to investigate the possibility of promoting Plaintiff's content, which would've carried monetary compensation in some form or another. For Defendants' purposes and other reference purposes, certain emails between Wynston and Plaintiff can be identified with the reference number #166225283 located in the subject heading of the email.

    1.8.        Defendant KAVITHA L/N/U (hereinafter "Kavitha") is an employee/agent of YouTube, Inc. (and/or Google, Inc.) who has corresponded with Plaintiff via email on behalf of YouTube and has made false promises to--and breached agreements with--Plaintiff with respect to such things as his application to both the YouTube Partner Program and advertising program. For Defendants' purposes and other reference purposes, certain emails from Kavitha to Plaintiff can be identified with the reference number #165339782 located in the subject heading of the email.

1.9.	Defendant EVELYN L/N/U (hereinafter "Evelyn"), is an employee/agent of YouTube, Inc. (and/or Google, Inc.) who has corresponded with Plaintiff via email on behalf of YouTube and YouTube's "Partner Program", and who has, inter alia, aided YouTube in their free engorgement of Plaintiff's creative content and labor through, but not limited to, such means as avoiding Plaintiff's application to the YouTube Partner Program, failure to adequately handle said application, and through deception, fraud, and avoidance tactics such as feigning ignorance. For Defendants' purposes and other reference purposes, certain emails between Evelyn and Plaintiff can be identified with the reference number #246027886 located in the subject heading of the email.

1.10	The only information Plaintiff has to identify above-listed defendants Harry, Heather, Wynston, Kavitha, and Evelyn is said name that they used to sign their correspondences to Plaintiff. It is possible that, like exotic dancers, these first names are made up as well. However, said correspondences are issued reference codes by YouTube which appear in the subject heading as well as the body of many of these saved email correspondences. GooTube should be able to provide Plaintiff or this Court with the full identity of these parties. And is instructed to do so.

## II.  JURISDICTION & VENUE

2.1.	Jurisdiction is conferred upon this court under 28 U.S.C. § 1331 and §1332.

2.2.	Venue is proper pursuant to 28 U.S.C. § 1391.

## III.  GENERAL ALLEGATIONS

3.1.	YouTube.com, like most websites, isn't worth much without its traffic -- which is generated by its content. As YouTube CEO, Chad Hurley, stated, "[W]e're a network built around the content." The content that YouTube offers is predominantly <u>other people's content</u>; just as the content that Google offers is predominantly <u>other people's content</u> - i.e., website and video content.

3.2     The main reason that serious content providers or Laborers, such as Plaintiff, provide content to YouTube.com at all, is to make a profit off of their creative work.

3.3     This isn't to say that the chief goal or original draw to the entertainment business or the content-creating business is to make money; however, it is an absolute necessary to sustain the work of content creating, especially when content creating is your full-time job. Notoriety, in itself, is of little consequence and is more of a myth of success than an actual reality.

3.4     Plaintiff has met people on the street who had stated that they knew him from--or saw him on--YouTube.com; but that doesn't mean anything to Plaintiff in the way of turning a profit or being able to continue creating content, as it also doesn't mean anything to Viacom in the way of making a profit when someone recognizes their popular shows on YouTube.

3.5     Viacom content gets unfathomable notoriety from various video clips of their content (posted without Viacom's permission) on YouTube.com, but is suing YouTube to have those same clips removed. Why, because notoriety without compensation equals a monetary loss and can serve only the ego.

3.6(a)  Comedy Central, NBC, ABC, HBO, and all of the major TV Networks, do not have their shows on the air for the purposes of notoriety. Any notoriety they receive serves the purpose of gaining paying sponsors and/or paying subscribers, which entertainment, on the whole, does not exist in the absence of.

3.6(b)  As is the case with TV networks, if YouTube were operating for the purpose of notoriety, they would not be in business. No one would know who they were, for they never would've been able to pay the bills if they weren't turning a profit. This is not a new business concept: that those providing a [profitable] service must be compensated or they cannot feasibly

continue providing that service. Said concept applies to all online and offline businesses, it applies to GooTube, it applies to Plaintiff, yet Defendants have not effected any payment to Laborers such as Plaintiff, but have induced Plaintiff into believing that they'd effect payment and other comp.

3.7  Plaintiff has created and uploaded over one hundred (100) original and professional videos to YouTube.com, which have aggregated over 3,500,000 (3.5 million) views--a traffic value woth up to 26 million based on Google indexes--and over 600 subscribers--a subscription value worth approximately $9,000 to $15,000. Generally speaking, Plaintiff has in fact uploaded over a thousand videos to YouTube.com, including promo and ad videos discussed below, but he claims traffic and monetary awards predominantly for the videos he uploaded to the accounts he applied to the YouTube Partner Program, referenced below, which is a number of videos totaling under 300.

3.8(a)  Just considering Plaintiff's two main accounts ('Youtube.com/Bennybaby' and 'Youtube.com/ProfessorCarlton')--containing about 130 videos between them, Plaintiff has had about 5,000 people comment on those videos (not counting SPAM comments) and maintains about a FOUR out of FIVE 'star' rating from YouTube users on those videos.

3.8(b)  However, despite the traffic (and notoriety) that Plaintiff and Plaintiff's content has generated on YouTube.com, and despite the hundreds to thousands of hours that Plaintiff has Labored in creating said content, generating said traffic, and managing his YouTube channels and webpages, Plaintiff has not been paid so much as one cent by Defendants.

3.8(c)  Further, and as a direct result of the intentional acts and omissions of Defendants, Plaintiff has been deadlocked by Defendants in his attempts to monetize his own content, traffic, and notoriety on YouTube.com. And furthermore, Defendants have deadlocked Plaintiff's attempts to monetize his marketing-based content on YouTube.com, in addition to his more artistic content.

3.9     Defendants know that Plaintiff and other content creators can't feasibly continue to exhaust their time, money, and resources creating entertainment serials with no compensation, so Defendants fraudulently convey that they will provide compensation--to those account holders or Laborers who fit a certain criteria--but then Defendants simply do not follow said criteria.

3.10    GooTube extracts and/or subcontracts and/or hires creative services from artists such as Plaintiff with the consideration of future consideration (and future promises) which they don't deliver on. Defendants employ an array of frauds and psychological manipulations to induce content creation and forced labor and other services on the part of content creatiors such as Plaintiff, in violation of state and federal law, as well as in violation of state, federal, and international labor laws.

3.11    Defendants are quite duplicitous in their dealings. They induce and manipulate their account holders and prospective account holders into believing that a certain amount of work cn YouTube.com will lead to their success. Defendants do so to create a frenzy of Laborers working to serve the growth of their websites. Defendants create a general aire of fame and fortune for those immersed in YouTube.com. Plaintiff recently received two "get-rich" emails on his Google email account; one email was entitled "Living the American Dream Thanks to YouTube" and the other was entitled "Why is You Tube the next best money maker?" Usually, emails are mass-mailed about an idea that has already reached mass consciousness as an easy and rewarding potential, such as free credit reports, Lasik surgery, diet solutions, penis enlargement, and "success" on YouTube.

3.12    Plaintiff hereby incorporates, as allegations in this paragraph of the Complaint, the following paragraph from Viacom's DMCA suit against GooTube, with Plaintiff's own addendums in brackets [ ]:

> *"YouTube has harnessed technology to willfully infringe copyrights* [and induce labor and content creation from users] *on a huge scale, depriving writers, composers and performers* [and other content creators] *of the rewards they are owed for effort and innovation, reducing the incentives of America's creative industries, and profiting from the illegal conduct of others as well. Using the leverage of the Internet, YouTube appropriates the value of creative content on a massive scale for YouTube's benefit without payment or license. YouTube's brazen disregard of the intellectual property laws fundamentally threatens not just* [Plaintiff], *but the economic underpinnings of one of the most important sectors of the United States economy."*

3.13    Essentially, YouTube is the 'Wal-Mart' of entertainment and other video content, but unlike Wal-Mart, YouTube <u>owns none</u> (by and large) <u>of the merchandise</u> which they sell and reap the profit from. In fact, they hardly sell it either, they <u>just</u> reap the profit from it. Unpaid artists like Plaintiff are the owners and predominant salesmen--or traffic aggregators--of the product which YouTube engorges the revenue from The product in this case: video entertainment/video content.

3.14    And so it goes, Plaintiff creates a video, uploads it to YouTube.com and directs people to see it. And for directing over 3.5 million viewers to Plaintiff's product on YouTube.com, Plaintiff has received <u>no</u> payment from YouTube, nor even the slightest sincere appreciation.

3.15    In fact, Defendants will not even communicate in any true or wholesome manner with Plaintiff (as well as other Laborers), despite the fact that Plaintiff is one of the top content providers and traffic aggregators to their site--estimated to be in the top 500 most viewed this past month, even though Plaintiff had essentially stopped adding videos to YouTube.com months prior.

3.16   If Plaintiff were to continue at the rate of video production and viewership he was aiming for about six to twelve months back when he was getting such 'YouTube Honors' as "#1 Most Viewed Comedian", and if Plaintiff had believed more in the chances that YouTube would pay him for his efforts, he would certainly be in the top 100 to 300 'most viewed' by now. However, the process that Defendants have taxed Plaintiff with in his attempts to garner a response on sharing revenue with YouTube took, to say the least, a great deal of the wind out of his sails.

3.17   Plaintiff's level of viewership cited above doesn't even take into account the fact that most of the other content creators or distributors that Plaintiff is comparing himself with are and have been promoted and "featured" by YouTube at the expense or resources of YouTube (and at the expense of Plaintiff), as opposed to Plaintiff's content which is predominantly promoted at his own expense and through his own resources. Plaintiff has not been promoted by YouTube--he has only been <u>somewhat</u> indexed in their search engine -- as well as hidden from their search engine.

3.18   Plaintiff has promoted his own work and webpages on YouTube by various means such as email, website and search engine marketing, video marketing and through other means of advertising. For an example, in his very early days on YouTube, Plaintiff wore a long sleeve shirt that read front and back "Youtube.com/Bennybaby" up and down Hollywood BLVD--and other hot and heavily trafficked L.A. streets--for a period of about a week.

3.19   Additionally, and not by his own choice, but forced upon him by Defendants, Plaintiff and his content have been used by YouTube to promote other content and sponsors.

3.20   When YouTube expends money or resources to promote a less popular user of their website than Plaintiff is, which YouTube has very regularly done and currently does, they are doing so partly at the expense of Plaintiff's and Plaintiff's Labors, as well and in violation of their

agreements with Plaintiff -- including, but not limited to, the agreement to promote their most popular users, not a <u>chosen few</u> as they do.

3.21 Defendants have and are embezzling the revenue (and traffic) generated by Plaintiff's creative content and Labors and using it to promote those who aren't as qualified--based on YouTube terms, agreements and promulgations--to be promoted as Plaintiff was and still is.

3.22 When YouTube promotes a user or sponsor of their site <u>against</u> Plaintiff's content or traffic (as they do and have done) without effecting any payment to Plaintiff (as they have not effected), especially after agreeing to effect such payment (which they've done), YouTube defrauds Plaintiff and employs said promotion of a user or sponsor at the expense of Plaintiff's.

3.23 Traffic directed to YouTube's website, generated by Plaintiff and his content, has been <u>redirected by Defendants</u> to other content and sponsored ads on and off of YouTube.com.

3.24 Plaintiff directed traffic to YouTube.com with the ultimate goal of monetizing said traffic. Defendants have prevented Plaintiff from monetizing his traffic on YouTube.com, however, <u>Defendants</u> have monetized Plaintiff's traffic wholly for themselves and their users and sponsors.

3.25(a) When a video is "featured", it means it is promoted by YouTube.com on the homepage or on another prominent area of their site. YouTube promulgates that one cannot "purchase" this featured slot, that it is an <u>earned process</u>. Popular video-sharing website www.Break.com has advertised paying content creators up to $2,000 dollars if chosen by Break.com to have their video 'featured' on Break.com's homepage.

3.25(b) Plaintiff contends that YouTube.com, being tens to hundreds of times bigger than Break.com, probably pays their users--whose video content they feature--at least ten times what Break.com pays--or $20,000 dollars--or if they don't, that they <u>must</u> lawfully do so.

3.25(c)  Plaintiff has exceeded YouTube's criteria to be featured yet has not been featured--while <u>YouTube has featured those who haven't even come close to meeting YouTube's [earned] criteria to be featured</u>. By creating a set of criteria to be featured on YouTube.com, and then by not following said criteria, YouTube induces their account holders to work towards the goal of meeting and exceeding said criteria for monetary and other consideration--by creating content for and drawing traffic to YouTube.com. But by not following said criteria, YouTube Extorts and induces labor from users such as Plaintiff who have trusted the criteria and worked towards fulfilling it. YouTube Unjustly Enriches itself by and through said Extortion and Inducement.

## IV.  DEFENDANTS' UNPAID SHARES AND TRAFFIC-AGGREGATION DEBT OWED TO PLAINTIFF

4.1  If one multiplies Plaintiff's daily traffic of approximately 11,200 views by 9,000, one arrives at over 100 million views per day, which is what YouTube boasts receiving in total approximate daily traffic--making Plaintiff's traffic equal to about 1/9000th of YouTube's traffic.

4.2  Plaintiff is a major contributors of content and traffic to YouTube.com. Subtracting porn spam, promoted and pirated content from the "1/9000th" equation of Paragraph 4.1, Plaintiff's daily traffic is estimated to be more like 1/1000th to 1/500th of YouTube's total daily traffic.

4.3  Using the unquestionable "1/9000th" figure to estimate Plaintiff's unpaid stake (or shares) in the company, Plaintiff's shares in YouTube (or Google) are worth approximately $200,000--or $3.6 million using the 1/500th figure--a figure derived basing the stock value of YouTube on the $1.65 billion they were bought for by Defendant Google in November of 2006.

4.4  Google stock has only surged higher since and as a result of acquisitions such as YouTube and since Plaintiff has started adding content to the YouTube website.

4.5     These aforementioned figures do not consider an estimate of the value of Plaintiff's traffic itself. In the last 75 days alone, Plaintiff videos on YouTube.com have garnered over 800,000 views, or the various webpages on YouTube.com hosting Plaintiff's content have had over 800,000 hits. A "hit" is measured each time a page is accessed or visited.

4.6     Additionally, Nielsen and internet ranking sites and professionals now track the value of "duration traffic" (the amount of time a person spends on a webpage) because engagement and behavior have become a much greater indicator of a website's worth than just mere "hits", which could just be for a fleeting moment.

4.7     Duration traffic (or time-based traffic) also creates a better environment for sponsors, and the ad space for potential sponsors is consequently worth more money than under a hits-only metric. For example, and on information and belief on the manner in which YouTube pays its revenue-sharing Partners, YouTube pays most of its Partners only a percentage of revenue accrued from actual ad 'clicks', and not on the five minutes a user of their website watching a Partner's video may spend staring at the animated ad displayed directly to the right of that video or on that video itself. The time spent viewing a sponsor's ad, in many cases, is the utmost consummation of the marketing goal that the sponsor could hope for. For further example, Dunkin Donuts and Heineken place ads on YouTube.com with the ultimate goal of branding their product, not to entice viewers to visit their webpage and read about the history of their company.

4.8     This is what Google knows that most others--especially critics of YouTube's worth--don't know or don't consider when calculating the value of a site like YouTube.com: that duration traffic is of much greater value than mere hits; the sites where people spend most of their engaged time (such as YouTube.com) are by far the most valuable websites on the internet.

4.9(a)   Plaintiff's fans and even his non-fans usually watch most or all the video of Plaintiff's that they have elected to watch; but even if they only watch 25% of the video (avg. length being about 4 minutes), users are spending over 180 hours <u>per day</u> on YouTube.com consuming Plaintiff's material and more time viewing Defendants' ads and promoted content; and this doesn't consider the additional time these users spend on other YouTube pages, viewing other content, as a direct result of Plaintiff's content driving them to YouTube.com in the first place.

4.9(b)   A person who visits www.MichaelMoore.com, and clicks on the homepage link to see Plaintiff's video: the "Go See SiCKO" rap by "MC Artificial", will be redirected to YouTube's website where the video will begin playing. To the right of Plaintiff's video, Defendants direct that person to see 18 other videos <u>not by Plaintiff</u>, which Defendants state are "Related" to Plaintiff's video. And beneath those videos, in addition to the option of seeing another 20 "Related Videos" <u>not of Plaintiff's</u>, Defendants direct said person--who came to YouTube to view Plaintiff's video-- to four "Promoted Videos", and to the accounts of the users with said "Promoted Videos".

4.9(c)   Half of those above-referenced four users ('mammoth9119', 'ijustine', 'CSPAN', and 'francedeforce'), who have YouTube "Promoted Videos" listed under Plaintiff's videos, have both less viewership and less subscribers than Plaintiff has on his Bennybaby account alone. However, Plaintiff isn't "Promoted" by YouTube as they are, despite the fact that YouTube leads off and has stated that they will promote or reward their "top-drawing" users. Plaintiff's account and the content thereof is more "top-drawing" than several of these "Promoted" users.

4.10    For the same keywords (and web content descriptions) that Plaintiff uses to drive traffic to Defendants' websites with no compensation from Defendants (keywords such as "Avril Lavigne", "Parody", "Comedy", "Humor", "Funny Video", "Akon", "Britney Spears",

"Paris Hilton", "Rap", "Rapper", "50 Cent", "Spider-Man", "Halo", "Mad tv" | hereinafter "Keywords"), Google would charge Plaintiff $5 to $10 dollars **per hit** if he wanted to send someone to **his own website** using those **same Keywords.**

4.11　And so, if said Keywords are worth an average of $7.50 per click to Google, the over 3.5 million views that Plaintiff garnered for YouTube would be worth, according to defendant Google, over $26 million ($26,000,000) dollars. Even Plaintiff's character names, such as "Bigga BLD", "Professor Carlton", "Wesley Johnson", and "MC Artificial"--which Plaintiff owns the sole rights to and the content thereof--are ringing up in Google Adwords (where traffic clicks are purchased through Google) at .50 cents each, except "Wesley Johnson" at $5 dollars per click.

4.12　GooTube can't have it both ways. They can't charge $10 dollars to someone, such as Plaintiff, for the same traffic that GooTube pays Plaintiff **nothing** for when the traffic is directed to their websites. Plaintiff contends that this and other conduct by GooTube, in addition to being grossly unfair, constitutes--among other egregious and unlawful conduct--Theft, Embezzlement, fraud (including Constructive Fraud and Fraud In the Inducement), Unjust Enrichment, Deception, and Bad Faith, as well as constitutes Antitrust and other state and federal violations of unfair competition, **Unfair Leverage, Restraint of Trade**, and **Monopilzation**; as well as a breach of the fiduciary responsibilities that Defendants share--and the inducements they make--with their users, partners, affiliates, and/or Laborers, of which Plaintiff is one.

4.13　Even at the lowest conceivable end of .50 cents per click, Plaintiff's traffic would be worth, according to Defendant Google, over $1.75 million ($1,750,000).

4.14　No matter how you look at it, Plaintiff's Labor for Defendants thus far has accrued him well over a million dollars by defendant Google's standards.

4.15    The last time Plaintiff checked, Yahoo.com's lowest cost-per-click price for traffic on any click-through term was .10cents, even if the term was unsued or completely uncompeted with by other bidders. Even at this very low rate of .10 cents for click-through traffic, Plaintiff's traffic aggregated to YouTube.com would be worth over $350,000.

4.16    Internet traffic is worth money. Most of those who run a business on the internet or consult for one will attest to this fact, and this Court could take judicial notice of this fact.

4.17    Additionally, "related traffic" (traffic specific to a user's interest) is worth volumes more than unrelated traffic.

4.18    In the same way that a basic telemarketing lead may cost .10 cents per lead, but a specific qualified mortgage lead may cost as much as 50 dollars, a basic hit may be worth ten cents but a hit derived from a more popular or valuable keyword, such as "Spider-Man" (a mainstream movie which Plaintiff owns several parodies of) Google charges $10 dollars per click.

4.19    Although Plaintiff is currently looking for every way to avoid dependence on YouTube, and has done quite everything reasonably possible to avoid litigation against Defendants, including initiating dozens of contact attempts (several of which are listed in the "YOUTUBE EMAIL DIGEST" appended to this Complaint and hereby incorporated as the allegations of the foregoing Paragraph 4.20 of the Complaint), it ranges from extremely difficult to impossible to gain independence from the internet-dominating GooTube, or even make contact with them. Plaintiff contends that this feigned inability to communicate of GooTube's is, inter alia, a disinformation ploy used to induce free labor for their own Unjust Enrichment.

4.20    Document entitled "YOUTUBE EMAIL DIGEST" appended to this Complaint serves as the allegations of this paragraph of the Complaint.

## V. ALLEGATIONS OF ANTITRUST, UNFAIR LEVERAGE AND FORCED LABOR INDUCEMENTS

5.1 The reason GooTube doesn't go out of its way to set up payment systems for its traffic aggregating Laborers, or even negotiate or answer emails is because they've figured out how to get away with not doing so, and because they're pretty close to owning the internet (in a business domination sense); and content-creating Laborers for GooTube can't feasibly go anywhere else, and that's exactly the type of leghold that GooTube is drivng to maintain over its Laboring victims. And by dominating on the internet, GooTube also dominates off the internet by commandeering off-the-internet material for their appropriation on the internet via their websites.

5.2(a) Industry expert Shelly Palmer, Chairman of The Advanced Media Committee and Managing Director of Advanced Media Ventures Group, LLC, states in his industry-welcomed book "Television Disrupted":

> *"Certainly Google* [which Shelly calls a "Contact Provider"] *enjoys an extraodrinary market cap for a company that does not create any original content. ... Google's market cap is bigger than the total commercial television advertising business... Are we likely to see an industry death match with marquee billing like "The entire television industry vs. the contact providers?" It is inevitable.*

5.3(b) GooTube put itself in a position to be pitted against the entire television industry in a similar way that Napster pitted itself against the entire music industry: By inducing everyone else's content onto their websites, on demand and free of commercial breaks and costs to viewers. Napster meets Shelly's definition of a "Contact Provider" too.

5.3(c) GooTube operates in an unlawful manner similar to that of the bygone Napster.

5.4(a) Continuing from Paragraph 5.1: And commandeering material is exactly what GooTube does. Plaintiff has never listed his various websites on Google.com, yet they show up on Google.com. One might ask Plaintiff, "Why would you complain about free notoriety?" Because, it isn't free and it isn't true notoriety. By so listing Plaintiff's and everyone else's material without their permission, Google can then charge Laborers, such as Plaintiff, for higher placement (or sponsored listings) on Google.com. And the Laborers will pay because they are getting traffic in return-- traffic which was generated solely by the content that their collective businesses created in the first place! In other words, GooTube charges businesses to sponsor themselves, as well as GooTube.

5.4(b) GooTube's entire business practice is the equivalent of making itself Czar of the world, taking everyone's land and then appropriating all the land back to everyone equally in one square-foot lots. And then anyone who is struggling to domesticate themselves on their one square-foot allotment can pay Czar GooTube an exorbitant fee, and GooTube will give them an acre's worth of land by pushing an acre's worth of square-foot lot holders into an even smaller area.

5.4(c) Plaintiff contends that Defendants owe their Laborers and the owners of the websites or videos or other content that Defendants list on GooTube's websites, a percentage of the revenue that Defendants collect from sponsors and could collect from sponsors, as well as a percentage of the value increase of their business or stock, because Defendants are only able to reap this revenue as a direct and sole result of their Laborers' efforts and their Laborers' content-- which Defendants have unlawfully commandeered.

5.4(d) As a direct result of their Laborers and their Laborers' content, Defendants are able to charge exorbitant prices, which they would not be able to charge otherwise, for Laborers to move to the top--on Google.com--of the very content for which the Laborers all collectively own.

5.4(e)  Instead of paying its Laborers, as they are required by law to do, GooTube is essentially <u>levying an unlawful tax</u> on its Laborers, and GooTube is required by law to pay back or disgorge that tax.

5.4(f)  Even if Defendants didn't owe their Laborers a percentage of the profits that their Laborers created for them, Defendants would still owe those who have garnered traffic to Defendants' websites, of which Plaintiff is one.

5.4(g)  When Plaintiff directs traffic to Google.com or YouTube.com, which he has done, Plaintiff is owed--by GooTube--a comparable fee to that which Google charges or would charge Plaintiff to direct traffic to Plaintiff's website.

5.4(h)  When Plaintiff's content aggregates traffic to Google.com or YouTube.com, which it has, Plaintiff--as well as other Laborers--is owed a reasonable fee for said traffic aggregation.

5.5  To restate or reiterate, by creating such easy access to be listed on the internet at a massive level--<u>though it is not valuable access</u> (much like the "one square foot lots" were not valuable land) **<u>because it is access on a massive level</u>**--GooTube makes it unfeasible for businesses to market their internet content directly to people because now people don't need to look for content anymore or follow business ads or other traditional methods to content, they can just "Google" everything. And since "everyone" is going to Google and YouTube to find everyone else's content, GooTube can step in and charge exorbitant fees to the traffic-squabbling Laborers--who collectively own all of Google's content--to be listed on the top of Google.com for certain searches.

5.6  If GooTube continues working with Yahoo.com, as they've already begun doing--and brought antitrust scrutiny from the federal government as a result--you could pretty much call GooTube's owernship/dominance of the internet a closed deal, if it's not already.